391 So.2d 706 (1980)
VIGILANT INSURANCE COMPANY, Appellant,
v.
Donna Maria KEISER, Appellee.
The CHILD GUIDANCE CLINIC OF DUVAL COUNTY, INC., Appellant,
v.
Donna Maria KEISER, Appellee.
Nos. NN-336, NN-337.
District Court of Appeal of Florida, First District.
December 11, 1980.
Rehearing Denied January 13, 1981.
*707 Bruce S. Bullock and Robert M. Sharp of Bullock, Sharp & Childs, P.A., Jacksonville, for appellants.
William C. Gentry of Bedell, Bedell, Dittmar & Zehmer, P.A., Jacksonville, for appellee, Keiser.
Marion R. Shepard of Mathews, Osborne, Ehrlich, McNatt, Gobelman & Cobb, Jacksonville, for appellee, Berry.
WILLIS, BEN C., Associate Judge.
The appellee, Donna Maria Keiser, sued Reginald V. Berry, M.D., a psychiatrist, to recover damages for his alleged negligence in treatment of her for mental and emotional health problems. Joined as defendants were Child Guidance Clinic of Duval County, Inc., and its insurance carrier, Vigilant Insurance Company, and also City of Jacksonville and its insurer, Travelers Insurance Company. The case proceeded to trial by jury on the issues of the negligence of defendant Berry, negligence of plaintiff, damages sustained, and on the vicarious liability of the Child Guidance Clinic and the City and their respective insurers. It is shown that plaintiff was a patient of Dr. Berry for the period of October 1975 to September 1977. For the period October 1975 to December 31, 1976 Dr. Berry was employed by Child Guidance Clinic, which held a liability insurance policy issued by defendant, Vigilant Insurance Company, to cover both the Clinic and Dr. Berry during that period. From January 1, 1977 until the last of Dr. Berry's treatment of Donna at the end of September 1977, he practiced in the Youth Resources Bureau, which is an agency of the City of Jacksonville.
A special verdict form was submitted to the jury, and specific findings were rendered that:
(1) Dr. Berry was negligent in his treatment of the plaintiff and such was a legal cause of injury and damage to the plaintiff;
(2) The total damages consisted of $35,000 for pain and suffering experienced to date, $25,000 for future pain and suffering, $40,054.93 for medical and hospital expenses to date, $141,010 for present value of future medical and hospital expenses, and $63,000 for present value of loss of earning ability in the future. This is an aggregate of $529,054.93.
The jury also found that plaintiff was not herself guilty of negligence which was a legal cause of any of her loss or damage. It also found that Dr. Berry was acting within the scope of his employment with defendant, Child Guidance, while he was treating the plaintiff, but that while he was associated with the City of Jacksonville he was an independent contractor, rather than an employee of the City. There is no challenge to any of these findings.
It is the Answers to Questions 7 and 8 which have raised the issues presented on this appeal. Question 7 states:
"Can you determine what portion of Donna Keiser's damages, if any, are attributable to the period of time from October 1975 through December 1976, as opposed to that portion of damages, if any, attributable to the period of time *708 from January 1, 1977 through September 1977?"
The response was: "Yes."
Question 8 and the response to it is as follows:
"If your Answer to the foregoing question is YES, state the percentage of damages suffered by the plaintiff, Donna Keiser, while she was receiving treatment from Dr. Berry during each period of time:

 October 1975 - December 1976 20%
 January 1, 1977 - September 1977 80%

Following the verdict, plaintiff moved for the entry of a judgment against defendants Berry, Child Guidance and Vigilant for all damages found by the jury to have been suffered by the plaintiff. Vigilant moved for the entry of a judgment against it of twenty percent of the total damages. The trial court, in a very detailed order, concluded that plaintiff is entitled to recover all damages found to have been sustained and that judgment in her favor for that amount should be entered against Dr. Berry, Child Guidance Clinic and Vigilant Insurance Company. After finding that there were collateral sources payments to the extent of a net of $26,775.39, which should be credited against the findings of damage, the Court entered a "final judgment" in the amount of $502,279.54 in favor of plaintiff against Berry, Vigilant and Child Guidance. It is from this judgment that Vigilant and Child Guidance appeal. Dr. Berry has not appealed and it is not contested that he was guilty of negligence in the treatment of plaintiff and that the damages assessed are supported by the evidence. There is no challenge to the findings of the jury that Dr. Berry was an independent contractor, and not an employee of the City of Jacksonville, for the period of January 1, 1977 until September 1977.
The real contention is made that under the findings of the jury in response to Questions 7 and 8, Child Guidance and Vigilant should be liable for only twenty percent of the total damages, as only that portion was found to be attributable to the period of October 1975 through December 1976. The point is made that since the jury concluded that the accrual of the damages could be apportioned between the period Dr. Berry was employed by Child Guidance and the period he was associated with the City, and proceeded to make such apportionment, it would follow that Child Guidance and Vigilant should be liable only for the damages suffered during the period of employment of Dr. Berry by Child Guidance, and the period of insurance coverage by Vigilant.
This seems to be a case of first impression in the appellate courts of this state. The trial court very ably set forth its findings and the reasoning for its adjudications. We set forth the pertinent parts of its "Order on Plaintiff's Motion for Entry of Judgment on Verdict":
"The Court must decide whether, as a matter of law, the plaintiff is entitled to judgment for all of her damages against defendants and whether questions 7 and 8 are irrelevant and may be disregarded. In entering judgment upon a special verdict, the Court may disregard irrelevant issues or special findings which are not supported by the pleadings or the evidence and should enter judgment based upon those findings which are supported by the evidence. 76 Am.Jur.2d, Trial, §§ 1203, 1142-1143, 1175; 89 C.J.S., Trial, § 531. Further, in entering a judgment on a verdict the verdict must be construed in accordance with the true intent of the jury and in conformity with the material issues made by the pleadings and the evidence in the cause and in accordance with the applicable law. See 32 Fla.Jur., Trial, §§ 257-258. See also Cory v. Greyhound Lines, Inc., 257 So.2d 36 (Fla. 1971).
"The jury concluded that the defendant Berry was negligent in his treatment of Donna Keiser. All of the experts, including the expert witnesses offered by the defendants, agreed that Berry's treatment did not comply with accepted standards. The jury further found that the plaintiff suffered substantial damages as a result of Berry's negligence. In so doing, the jury assessed the majority of plaintiff's damages for future losses, including future mental pain *709 and suffering and substantial damages for future medical care and loss of ability to earn money. Such a finding is consistent with the manifest weight of the evidence that, as a result of Berry's failure to provide Donna Keiser with proper care when at age seventeen she first came to him in October, 1975 and was most amenable to treatment, the prospects of her recovering from her mental disorder were substantially diminished. Thus, plaintiff's experts testified that as a result of the failure to receive proper treatment while she was still an adolescent, the prospects of increased future medical care and hospitalization were substantially increased and her ability to obtain and maintain employment at a level commensurate with her intelligence was substantially diminished. Based upon its award of future damages for medical care and impairment of earning capacity, the jury obviously accepted such testimony. Furthermore, in accordance with Standard Jury Instruction 6.2b, the jury also obviously concluded that it could not determine what portion of plaintiff's damages resulted from an aggravation of her pre-existing condition and held defendant Berry liable for the whole. Thus, they assessed the plaintiff's hospital and medical expenses to date in the full amount, rather than apportioning such damages.
"The evidence adduced at trial established that, although plaintiff initially appeared to improve after coming under Berry's care, as she continued under his treatment, her symptoms began to manifest themselves to the point that by the time she left his care in September, 1977, she was found to be psychotic and required hospitalization for approximately nine months. All of the psychiatrists-experts, except Dr. Shellow who appeared in behalf of Vigilant and Berry, testified that it was medically impossible to allocate any of the damages suffered by the plaintiff to any time period during which she was seen by Berry. Dr. Shellow, whose testimony Vigilant relies upon to support its claim for proration, testified that Donna Keiser did not have any continuing injury or damage; that her future medical care and impairment of function and other claimed losses were due to her pre-existing condition and were not affected by Berry's treatment; and that in his opinion, the only harm caused by Berry was that his treatment contributed to plaintiff having to go into the hospital in September, 1977. He further expressed an opinion that since plaintiff's condition apparently deteriorated during the period of time leading up to the hospitalization at Shands in Gainesville, she apparently suffered more of that damage during the latter part of the treatment than during the first part.
"By its verdict, the jury obviously did not accept Dr. Shellow's testimony regarding Donna Keiser's future damages. However, the jury awarded plaintiff only $35,000.00 for her pain and suffering to date and by answer to interrogatory numbered 8 apparently concluded that the symptoms and damages attributable to Berry's negligent treatment primarily manifested themselves during the latter part of his treatment. Thus, the jury allocated Donna's damages while she was seeing Berry from October, 1975 through September, 1977 to twenty percent during the first 14 months and eighty percent during the last 8 months.
"On the basis of the jury's finding in response to question number 8, Vigilant asks the Court to enter judgment against it for only twenty percent of all the damages suffered by the plaintiff, including the $454,000.00 in future damages found by the jury. However, the Court is of the opinion that to do so would be contrary to law and the manifest weight of the evidence and would not be consistent with the jury's intent as shown by the entire verdict.
"Under Florida law, if a tortfeasor negligently causes or substantially contributes to causing damage to another, he is liable for all such damages. In an action against more than one tortfeasor, each is jointly and severally liable for all plaintiff's damages, regardless of the relative degree of fault of each tortfeasor. See Issen v. Lincenberg, 293 So.2d 777 (Fla.3d DCA 1974), Lincenberg v. Issen, 318 So.2d 386 (Fla. 1975). Thus, in the above case, where the jury found that Lincenberg was fifteen percent *710 negligent and another party was eighty-five percent negligent, the court was nevertheless required to enter all of plaintiff's damages against Lincenberg. The continued vitality of this common law rule became questionable after the Florida Supreme Court's adoption of the law of comparative negligence requiring proration of negligence between a negligent plaintiff and a contributorily negligent defendant. See Hoffman v. Jones, 280 So.2d 431 (Fla. 1973). However, as reaffirmed by the Florida Supreme Court in Lincenberg, supra, and later discussed in Lawrence v. Florida East Coast Railway Company, 346 So.2d 1012 (Fla. 1977), although a jury should compare the negligence of a plaintiff to that of the defendants in a comparative negligence situation, the relative negligence of a defendant to that of another has no bearing on the right of the plaintiff to collect all of his damages from any one of the tortfeasors. It is appropriate only to a claim for contribution among tortfeasors. See also Souto v. Segal, 302 So.2d 465 (Fla.3d DCA 1974).
"In the instant case, it has been established that Berry was negligent during the period of October, 1975 through December, 1976 and that such negligence caused or contributed to causing plaintiff's damages. It is instructive to note that, under the applicable law, Berry would be liable for all of her damages even if her damages had been worsened by the subsequent negligent treatment by another psychiatrist from whom the plaintiff might have sought treatment after December, 1976. Such a result is clearly recognized by the Supreme Court in Stuart v. Hertz Corporation, 351 So.2d 703, 707 (Fla. 1977). This Court is persuaded that Berry's insurance carrier and employer during the aforesaid time period would likewise be responsible for all of plaintiff's damages even if the damages were worsened by another negligent psychiatrist administering treatment subsequent to December, 1976. See Stuart, supra, and Osborne v. Hartford Accident and Indemnity Co., 476 S.W.2d 256, 263 (Tenn. App. 1972). This would be even more apparent where, as in the instant case, only one psychiatrist has treated the plaintiff continuously during the entire time period.
"Vigilant Insurance Company's responsibility for paying damages is derivative of Dr. Berry's liability. The policy in issue is an occurrence policy, that is, Vigilant agrees to pay `all damages because of ... [i]njury arising out of the rendering of or failure to render, professional services ...', during the policy period. As in all such liability policies, the insurer's obligation is not simply limited to damages which occur during the policy period. Rather, as stated in the policy, it is obligated to pay `all damages' which arise out of injuries caused by the defendant's negligence during the policy period.
"Vigilant did not request a special interrogatory to the jury on the issue of whether the plaintiff suffered injury as a result of Berry's negligence during the period October, 1975 through December 31, 1976, which question might have been germane to the issue of its coverage. However, it is clear from the evidence and from the jury's verdict that Berry was negligent during such period of time and that the plaintiff suffered injury as a result thereof. Indeed, the substantial verdict for future medical care and impairment of earning capacity indicates the jury's finding that Berry's failure to provide early treatment during the time he was at Child Guidance and covered by Vigilant resulted in plaintiff suffering substantial injury. Furthermore, there was no evidence adduced at trial to rebut the expert opinion testimony regarding the future consequences of lack of early treatment. The jury's verdict on this point is therefore consistent with the evidence and inasmuch as Berry is liable for all damages which his negligence during this period of time caused or contributed to causing, Vigilant Insurance Company is obligated to pay such damages.
"Over objection of all other parties in this cause, the Court agreed to include questions on the verdict form regarding Vigilant's contention that the jury should prorate the damages for the period of time after Vigilant ceased to have coverage. After having *711 fully studied the applicable law, the Court is of the opinion that a question regarding prorating negligence between defendants may have been appropriate if the City had not dismissed its claim for contribution. However, in the absence of a claim for contribution, such an allocation of negligence among the defendants would be irrelevant to plaintiff's right to recover all of her damages against Berry and his insurer inasmuch as such damages were caused at least in part by his negligence during the policy period. See, e.g., Osborne v. Hartford Accident & Indemnity Co., 476 S.W.2d 256 (Tenn. App. 1972). Furthermore, such issue was not previously raised by Vigilant in its pleadings or in its pre-trial stipulation.
"In addition, there was no competent evidence offered by Vigilant from which the jury could have attempted to allocate plaintiff's damages to different periods of time when Berry was treating her. Indeed, there was no evidence adduced at trial or offered by Vigilant from which damages for plaintiff's future loss could be allocated, the uncontradicted evidence being that such damages were due to the entire course of negligent treatment and incapable of any proration. Accordingly, there was no sufficient basis upon which the jury could undertake to allocate damages even if there were a legal basis to do so. See Security Life & Trust Company v. Jones, 202 So.2d 906, 909 (Fla.2d DCA 1967).
"During the trial, the Court attempted to fashion questions to the jury to conform with Vigilant's request. Vigilant did not provide the Court with forms or questions or instructions on the law regarding the issues sought to be resolved by such questions. The questions as finally phrased, numbered 7 and 8 on the verdict form, were not objected to by Vigilant, except that Vigilant's counsel argued that such questions should be in mandatory language directing the jury to apportion rather than asking the jury if it could apportion the damages to the two periods of time. At the hearing held Friday, February 16, 1979, on the motion to enter a judgment on the verdict, Vigilant's additional counsel stated that Vigilant had no objection to the Court having made such question optional. Therefore, the only reservation that Vigilant had to questions 7 and 8 has effectively been withdrawn.
"As phrased, question number 7 asked the jury if it could attribute any damages to the two periods of time. Upon answering yes, question number 8 asked the jury to state the relative percentages of damages which Donna Keiser suffered from October, 1975 through September, 1977 while she was receiving treatment from Berry. Such questions do not address the issue of whether Berry was negligent during each such period of time or whether such negligence was a legal cause of loss, injury or damages suffered thereafter. The jury answered the question by saying that of the damages that occurred while plaintiff was being treated by Berry, twenty percent occurred from October, 1975 through December 31, 1976 and eighty percent occurred from January 1, 1977 through September, 1977. Such a finding is consistent with the evidence that the plaintiff's symptoms did not become worse nor did her condition begin to deteriorate until the latter part of the time she was under Berry's care. However, although possibly indicating the attention which the jury gave to the evidence and the efforts which they made to carefully evaluate the testimony and reach their verdict, the answers to questions numbered 7 and 8 are not controlling as to Berry's and Vigilant's liability for all of plaintiff's damages arising out of his negligent treatment. Moreover, answer number 8 further confirms that the plaintiff did suffer injury during the policy period as a result of Berry's negligence. Vigilant is therefore liable for `all damages' for `which the insured shall become legally obligated to pay' as a result of his negligence. (Part One, Vigilant Policy.)
"Questions numbered 7 and 8 as framed do not speak to the issues sought to be raised by Vigilant and provide no basis for the Court to enter a judgment against Vigilant for less than the full damages which the jury assessed against its insured. To attempt to reduce the $454,000.00 in future *712 damages would not only be contrary to law as previously noted herein but would also be contrary to the manifest weight of the evidence and not in conformity with any finding by the jury. Having asked for questions number 7 and 8 to be given and making no objection to the form of those questions, Vigilant cannot now complain that the jury's answers to such questions are not responsive to the issue of the amount of damages to be assessed against it. See Crawford v. DiMicco, 216 So.2d 769 (Fla. 4th DCA 1968); Isenberg v. Ortona Park Recreational Center, Inc., 160 So.2d 132 (Fla. 1st DCA 1964).
"Based on the foregoing, the Court concludes that by its verdict entered on February 9, 1979, the jury found that the defendant Berry was negligent in his treatment or failure to properly treat the plaintiff; that the plaintiff was herself not guilty of any contributory negligence; and that Berry's negligence during the time he was covered by Vigilant Insurance Company was a legal cause of plaintiff's total damages in the amount of $529,054.93. Based upon Berry's and Vigilant's motion to reduce the award by collateral sources, the affidavit of plaintiff's counsel offered at the hearing on February 16, 1979, and the agreement of the parties at such hearing, the Court further finds that medical insurance benefits have been received by the plaintiff in the amount of $28,124.89, for which the plaintiff or members of her family have paid premiums in the total amount of $1,349.50, and that the judgment should be reduced by $26,775.39. Accordingly, final judgment in the amount of $502,279.54 shall be entered in favor of the plaintiff and against Reginald V. Berry, M.D., Vigilant Insurance Company and The Child Guidance Clinic of Duval County, Inc."
The appellants cite the case of Aetna Life Insurance Company of Hartford Conn. v. Maxwell, 89 F.2d 988 (U.S. 4th CCA 1937), which it contends is directly in point. The trial court did not refer to this case. They also attack the statement in the Order that Vigilant had not previously in its pleadings or pre-trial stipulation, raised the issue of prorating damages to the period after Vigilant ceased to have coverage. It is contended that this is in error as the Answer of Vigilant denied any coverage or benefit to plaintiff at times other than for the specific period of time which was admitted. In addition, it is said that the issue was thoroughly discussed by the court and all counsel several times in chamber proceedings. In reading the challenged statement in the full context of the Order, it is obvious that the treatment of prorating in the pleadings and the pre-trial stipulation, or lack of it, had little weight in reaching the conclusions stated. The full thrust of the conclusion of liability of Child Guidance and Vigilant for all damages is that actionable negligence having been shown during the period of liability then these defendants had responsibility for all damages which had their inception during the covered period, including those which became manifest during another period or which worsened by subsequent negligence of the defendant Berry. The contents of the pleadings and the pre-trial stipulation were not a significant factor in the disposition of the case by the trial judge.
The Aetna case, supra, involved an action brought by an infant plaintiff to recover from an insurance company damages for loss of a leg occasioned by the negligent treatment of a physician who was covered by a group liability policy issued by defendant company to a medical society of which the physician was a member. A judgment against the physician had been recovered for the sum of $6,000, but execution was returned unsatisfied because of the doctor's bankruptcy. The sixteen-year-old plaintiff had sustained a fracture of the leg on March 25, 1932 and was treated by the doctor involved from March 26 to August 7, 1932. The policy of insurance was not issued until July 23, 1932. In the suit against the physician it was charged that he had been guilty of malpractice and negligence throughout the period of employment and that it became necessary to amputate the leg. In the action against the insurance company verdict was rendered against the company for $4,022.67, which the jury *713 found to be the damages suffered through the malpractice which occurred during the policy period. The evidence in the suit against the doctor involved a number of particulars of malpractice, most of which occurred prior to the onset of the policy period on July 23, 1932. Evidence in behalf of the doctor was submitted to show he had followed approved methods and practice and had at no time been negligent during the period of treatment. Since the doctor was responsible for the consequences of his neglect whenever it occurred, no attempt was made to distinguish between the period before and the period after the policy became effective. At the trial against the insurance company the defendant sought to offer in its defense the testimony of several physicians to show that, if any malpractice occurred, it occurred prior to the beginning of the policy period and that all treatment from July 23 to August 7 was proper and did not contribute to the damages suffered but would have, if allowed to continue as the doctor proposed, quite likely caused the fracture to be reduced and an amputation avoided. This offer was rejected by the trial judge, on the theory that the insurer, having participated in the defense, even though on a nonwaiver agreement to preserve its right to deny liability, was bound by the judgment upon the issues at stake there. The Court ruled that a judgment in the first suit was not conclusive in the suit directly against the insurer and that there are different issues in the two suits. It therefore held it was error to reject the proffered testimony. After pointing out that the issue in the first suit was whether or not the defendant doctor had been guilty of negligence at any time during his treatment of the injury, that in the suit against the insurer the defendant company is only liable for such malpractice or neglect as took place between July 23, the date of the policy, and August 7, when the physician was discharged from the case. There was no liability for any negligence which took place before July 23. The Court stated, (p. 992):
"Since it was necessary for the jury to distinguish between the effects of the medical and surgical treatment before and after July 23, the evidence of medical men was particularly relevant; and, if the jury had had the assistance of their expert advice, they could have more readily decided whether the substantial damage to the plaintiff was done during the preliminary period of 119 days, when the kind of treatment was determined upon and the greater part of it administered, or during the final 16 days after the issuance of the policy and before the physician was dismissed."
The case was remanded for a new trial.
The Aetna case, supra, differs from the case before this Court, in that there was no question that the insurer was not liable for any actions before the policy came into effect. The question here is liability for consequences after the end of a policy period but which first arose for negligent acts during the policy period. The Aetna case is not in point and in any event would not be controlling.
We deem that the trial court fully and fairly defined the issues and applied correct principles of law and its factual conclusions are supported by the evidence. Not finding any error in the Order appealed, the same is hereby
Affirmed.
ERVIN, J., concurs.
BOOTH, J., dissents with opinion.
BOOTH, Judge, dissenting:
The judgment below, as affirmed by the majority here, holds employer, Child Guidance Clinic, liable for the torts of its former employee committed after the employment relationship was terminated. That is contrary to the verdict of the jury, which found that 20 percent of the damages were attributable to the actions of Dr. Berry while he was employed by Child Guidance Clinic (October, 1975 through December, 1976) and 80 percent attributable to Berry's actions while working at Youth Resources *714 (January, 1977 through August, 1977).[1] There was evidence supporting the jury's findings that the damages "attributable"[2] to the two periods could be determined and that a greater proportion of the damage resulted during the second period. The jury verdict being thus supported, the trial court erred in entering judgment for plaintiff's entire damage against the former employer, Child Guidance Clinic, and the insurer, Vigilant.
This suit was brought against Dr. Berry, Child Guidance Clinic, Youth Resources and the respective insurers, Vigilant and Travelers; but plaintiff was unsuccessful in establishing that an employment relationship existed between Berry and Youth Resources. The jury's finding in its special verdict that Berry was an independent contractor while working at Youth Resources rendered the insurance coverage of that agency unavailable as a source of satisfaction for plaintiff's judgment. Plaintiff then sought and obtained judgment for the entire amount of the damage against the employer, Child Guidance Clinic, and the insurer, Vigilant. This was error. In order to require Child Guidance Clinic and Vigilant to shoulder the entire responsibility, plaintiff had the burden of establishing that all the damages resulted from the torts of Dr. Berry committed during the period of employment by Child Guidance. Plaintiff failed to carry that burden. The record reveals a factual issue, which the jury resolved following the special instructions of the verdict. In the event those instructions were improper, a new trial is required.
The evidence showed that Dr. Berry was guilty of a series of tortious acts of commission and omission extending over a 23-month period. These torts included sexual abuse and exploitation of the patient, negligent administration of drugs on numerous separate occasions and failure to prescribe proper drugs and treatment. Even the plaintiff does not contend that all the damages, regardless of when manifested, resulted from torts committed during Berry's employment at the Clinic. Indeed, plaintiff introduced, and relied substantially, on evidence of Berry's tortious acts with respect to the plaintiff occurring after he left Child Guidance Clinic. The fact that the doctor-patient relationship had its inception while Berry was employed by the Clinic does not render the Clinic thereafter and forever liable for the malpractice of Berry with regard to that patient. A causal connection must be shown between acts performed during the employment and damages resulting. Here, there was no evidence that the Clinic or its former employment was in any way involved in the continuation of the doctor-patient relationship or the tortious acts committed by Berry after employment ceased.
The doctrine of respondeat superior is based on the assumption that the master controls the acts of the servant and is, therefore, liable for the consequences of those acts. In Variety Children's Hospital v. Perkins, 382 So.2d 331 (Fla.3d DCA 1980), a suit was brought against a hospital for negligent post-operative care of a patient. The active tortfeasors in that case were nurses and residents employed at the hospital. The hospital contended that the admitting *715 physician, who performed the surgery and stood in the relationship of master-servant to those hospital employees at the time of the operation, was responsible for the post-operative negligence. In rejecting this contention, the District Court held:
Such an employee may, it is true, come under the direction and control of any attending physician so as to shift the responsibility for his acts from the hospital to the doctor. The most familiar of this process occurs in the operating room where each of the attending personnel comes under the authority of the surgeon as the "captain of a ship." ...
But this principle has utterly no application to the case at bar, in which the negligence occurred when the surgery had long since been completed and the surgeon was neither physically present nor any longer directing the activities of the hospital employees. It is a fundamental rule that the respondeat doctrine applies only when the alleged master has the ability and authority to direct and control the pertinent acts of the employee. (e.s.)
In Wayne v. Unigard Mutual Insurance Company, 316 So.2d 581 (Fla.3d DCA 1975), the court held that there could be no liability under the rule of respondeat superior where the tort in question occurred after the employee-tortfeasor had been discharged from employment.
Nor were Dr. Berry, Child Guidance Clinic and Vigilant joint tortfeasors. Principles applicable to joint tortfeasors were erroneously relied on below as the basis for setting aside the attribution portion of the jury verdict. In Phillips v. Hall, 297 So.2d 136, 137 (Fla. 1st DCA 1974), this court held:
While at times the term "joint tortfeasor" has been loosely used in some cases in connection with the doctrine of respondeat superior ... in its true sense, a master and servant are not joint tortfeasors when the only relationship which the master has to the tort of the servant is that he is his employer. The Supreme Court in New Hampshire in McNamara v. Chapman [81 N.H. 169, 123 A. 229 (1923)], in a well-reasoned opinion points this out .. . "The master not being morally guilty, his liability should extend no further than is necessary to give the aggrieved party redress for the wrong done by the servant. Technical or inequitable rules said to be applicable to joint tortfeasors, and invoked in behalf of the present plaintiff, are not applicable to the present situation ..." (e.s.)
Here, there is but a single active tortfeasor, Dr. Berry, who is unquestionably liable for the entire damage suffered by plaintiff as a result of the 23 months of treatment. The liability of Child Guidance and Vigilant is based on employment and contractual relationships. Damages are properly subject to attribution as to time periods for the purpose of determining vicarious liability and insurance coverage. See, Aetna Life Insurance Company v. Maxwell, 89 F.2d 988 (CCA 4th W. Va. 1937).
The jury heard the evidence, considered the relationships of the parties, the circumstances that existed, and made the necessary determinations. The jury's evaluation of these circumstances is entitled to great weight. Its assessment of the greater part of the damages to the latter period of treatment is supported by the testimony of Dr. Shellow and by the fact that, prior to January of 1977, plaintiff had improved sufficiently to attend a large university away from her home; but, subsequently, after nine months of treatment while Dr. Berry was associated with Youth Resources, she declined dramatically and was required to be admitted into the hospital in Gainesville. I would reverse the judgment below and remand for entry of a judgment in accordance with the verdict of the jury.
I respectfully dissent.
NOTES
[1] Special verdict, in pertinent part:

7. Can you determine what portion of Donna Keiser's damages, if any, are attributable to the period of time from October 1975 through December 1976, as opposed to that portion of damages, if any, attributable to the period of time from January 1, 1977 through September 1977?
 Yes x 
 No ____
8. If your answer to the foregoing question is YES, state the percentage of damages suffered by the plaintiff Donna Keiser while she was receiving treatment from Dr. Berry during each period of time:

 October 1975 - December 1976 20 %
 January 1, 1977 - September 1977 80 %

[2] The parties urge different meanings of "attributable" as used in verdict. Websters Third International Dictionary, Unabridged, p. 142, shows "attributable" means capable of explanation "as caused by or brought about by; ... as occurring in consequence of or on account of." Questions 7 and 8, taken together, are the jury determination that Berry's tortious acts committed during the two time periods caused the percentages of damages indicated.